# Exhibit 2

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

**1:19-CV-20592-MARTINEZ/OTAZO-REYES**

VASSILIOS KUKORINIS, on behalf of himself and those similarly situated,

        Plaintiff,

v.

WALMART, INC., a Delaware corporation

        Defendant.

**DECLARATION OF JOHN YANCHUNIS IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY APPROVAL**

I, John A. Yanchunis, declare pursuant to 28 U.S.C. § 1746 as follows:

1. I am an attorney with the law firm of Morgan & Morgan Complex Litigation Group.[1] I am licensed to practice law in the state of Florida. I have been licensed to practice law in Florida since 1981. I am also admitted to practice in this District. I have personal knowledge of the matters stated in this declaration and could and would testify to these matters if called as a witness.

2. I lead the National Consumer Class Action Department of Morgan & Morgan's Complex Litigation Group. I am one of the attorneys for Plaintiff and the proposed Class in this Action. I submit this declaration in support of Plaintiff's Unopposed Motion for Preliminary Approval of Class Action Settlement.

---

[1] Unless otherwise noted, all capitalized terms are defined in the Motion for Preliminary Approval or the Settlement Agreement and Release, which are being filed concurrently herewith.

1

3. My practice—which began after completing a two-year clerkship with United States District Judge Carl O. Bue, Jr., Southern District of Texas, Houston Division—has concentrated on complex litigation and spans over 37 years, including consumer class actions for more than two-thirds of that time. I have represented consumers in numerous successful class actions involving a wide variety of claims and topics from anti-trust, securities, civil rights, defective products, deceptive and unfair trade practices, common law fraud, and the protection of the privacy rights of consumers.

4. For example, this Court appointed me as co-lead counsel in the successful prosecution of the two largest class action cases in the United States: *Fresco v. Automotive Directions, Inc.*, Case No. 03-61063-JEM, and *Fresco v. R.L. Polk,* Case 0:07-cv-60695-JEM (Southern District of Florida). These cases were filed against the world's largest data and information brokers – Experian, R.L. Polk, Acxiom, Reed Elsevier (which owns Lexis-Nexis) and others – to protect the important privacy rights of consumers.

5. I presently serve and have served in the past as lead, co-lead, or class counsel in numerous multi- district litigations across the country in a wide variety of areas affecting consumers. For instance, I served as co-lead of the *Home Depot Data Breach*, a member of the Five-member Executive Committee in the *Target Data Breach*, No. 0:14-md-02522-PAM (Dist. Minn.), a member of the three-member Plaintiffs' Steering Committee in *In re: U.S. Office Personnel Management Data Security Breach Litigation*, 1:15-cv-01321-ABJ (D.D.C.), and a member of the Plaintiffs' Steering Committee in *In re Equifax, Inc. Customer Data Security Breach Litigation*, 1:17-md-2800-TWT (N.D. Ga.). I presently serve as Lead Counsel in *In re Yahoo! Inc. Customer Data Security Breach Litigation*, 16-MD-02752-LHK (N.D. Cal.), a case involving a data breach of over 2.9 billion users of Yahoo's email service. The court in that case

recently entered final judgment and approved the settlement of the claims of a class of consumers in the United States and Israel.

6. As a result of my experience in litigation against the insurance industry, including class litigation, I served as lead counsel for the insurance regulators for the state of Florida in connection with their investigations of a number of insurance companies and brokers of allegations of price fixing, bidding rigging, undisclosed compensation and other related conduct, and negotiated a number of settlements with insurance companies and brokers who were the subject of those investigations. These investigations resulted in the recovery of millions of dollars for Florida policyholders and the implementation of changes to the way insurance is sold in Florida and throughout the United States.

7. During my career, I have tried numerous cases in state and federal courts, including one of the largest and longest insurance coverage cases in U.S. history, which was filed in 1991 by The Celotex Corporation and its subsidiary, Carey Canada, Inc. During the seventeen years the case pended, I served as lead counsel for several insurance companies regarding coverage for asbestos and environmental claims. The case was tried in three phases over several years beginning in 1992. I was also lead counsel for these parties in the subsequent appeals that followed a judgment in favor of my clients.

8. As result of my experience in the area of class litigation and ethics, I have served as an expert for The Florida Bar on ethical issues arising in class action litigation.

9. I am currently a member in good standing of The Florida Bar, and of all the bars to which I have been admitted, including the United States Supreme Court, the United States Court of Appeals for the Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits, and the United States District Courts of the Southern District of Texas, Northern District of Texas, Eastern District of

Wisconsin, Western District of Wisconsin, Western District of Tennessee, Middle District of Florida, Southern District of Florida, Eastern District of Michigan, and Northern District of Illinois.

10. Attached as **Exhibit 1** to Plaintiff's Unopposed Motion to Direct Notice and Grant Preliminary Approval of Class Action Settlement, filed concurrently herewith, is the Settlement Agreement and Release entered into in this Litigation along with each of its exhibits ("Settlement Agreement" or "Settlement" or "SA"). [2]

11. Before this case was a filed, Plaintiff and Plaintiff's Counsel conducted an extensive investigation into the factual underpinnings of this case, and the conduct of Walmart alleged herein. Additionally, after the filing of this case, and with the benefit of extensive data provided by Walmart, Plaintiff's Counsel engaged the services of an expert to analyze the data provided to develop a damages model.

12. Thereafter, the Parties began exploring potential, preliminary settlement discussions, and then engaged in more formal settlement negotiations that included the exchange of information responsive to the discovery requests, settlement information, and term sheets.

13. To help facilitate settlement negotiations, the Parties agreed on and retained Ms. Michelle Yoshida of Phillips ADR—a highly respected mediator with significant experience concerning fraudulent, deceptive, and unfair trade practices class actions and other types of complex class actions—to conduct an initial mediation in this Litigation on November 19, 2019 for the Florida-based class.

14. As a condition of mediation, Plaintiff's Counsel sought information from Walmart regarding the sales data for Weighted Goods during the Class Period. Walmart provided this

---

[2] Unless otherwise noted, all capitalized terms are defined in the Settlement.

4

information to Plaintiff's Counsel pursuant to Federal Rule of Evidence 408.

15. In advance of the mediation, the Parties briefed Ms. Yoshida on their respective positions on the facts, claims, defenses, and assessments of the risk of litigation.

16. The information exchanged prior to mediation provided my co-counsel and I with the foundation necessary to understand and appreciate the underlying facets of the Pricing Practices, the scope of potential overcharges, and the risks of continued litigation. As stated earlier, we also retained an expert to analyze the data, develop damages models, and determine statistically the amount potentially at issue in this Litigation.

17. On November 19, 2019, the Parties participated in a full-day mediation session with Ms. Yoshida that included attorneys and representatives for both Parties, a Walmart representative, and Plaintiff. The negotiations were hard-fought throughout and the settlement process was conducted at arm's length. Following this full-day session of negotiations, the Parties agreed to further mediate this case as a nationwide class.

18. Following the initial mediation, Walmart provided similar information regarding sales data for Weighted Goods during the Class Period, but instead of limiting the scope of that information to Florida sales, Walmart provided nationwide sales data for the Class Period.

19. On March 18, 2020, the Parties participated in a second, full-day mediation session with Ms. Yoshida via virtual format due to COVID-19. The Parties were able to reach a tentative settlement, and engaged in additional sessions with Ms. Yoshida to further refine the details of the Settlement Agreement currently before this Court.

20. During the mediation sessions, the Parties set forth and discussed their respective positions on the merits of the Class claims and the potential for a settlement that would involve class-wide relief. The Parties exchanged offers and counteroffers and negotiated the points of each

vigorously, including detailing their respective positions and models for class-wide relief. Ultimately, the Parties were able to reach the fundamentals of resolution.

21. Based on Plaintiff's Counsel's independent investigation of the relevant facts and applicable law, experience with other class actions concerning fraudulent, deceptive, and unfair trade practices, and the information provided by Walmart, Plaintiff's Counsel has determined that the Settlement is fair, reasonable, adequate, and in the best interest of the Settlement Class. Consequently, the Parties worked together to prepare a comprehensive set of settlement documents, which are embodied in the Settlement.

22. Additionally, Plaintiff's Counsel relied on their experience presenting expert evidence and litigating the key legal issues they were likely to face here in other fraudulent, deceptive, and unfair trade practices cases to assist in evaluating the merits of this case and reaching the Settlement.

23. The Settlement resulted from extensive arm's-length negotiations between experienced counsel with an understanding of the strengths and weaknesses of their respective positions in this lawsuit, assisted by an experienced and respected mediator.

24. Additionally, the Parties spent significant time negotiating the terms of the final written Settlement Agreement which is now presented to the Court for approval. At all times, these negotiations were at arm's length and, while courteous and professional, the negotiations were intense and hard-fought on all sides.

25. Throughout the mediation and settlement process, and before finally entering the Settlement, we carefully weighed with Plaintiff—who was present for the November mediation session and available throughout the March mediation session—the following: 1) the benefits to Plaintiff and the Settlement Class under the terms of this Settlement; 2) the range of the possible

results at trial, including that the case could be lost and no relief provided to any class; 3) the attendant risks and uncertainty of litigation, especially in complex cases such as this case where certification is by no means a given and would be challenged if litigated and appealed if the Court certified any proposed class; 4) the difficulties and delays inherent in such litigation in the event that Walmart were to seek appellate review of the Court's Final Judgment, even in the event Plaintiff and any class are successful at trial; 5) Walmart's vigorous defense of the Litigation and continued denial of the claims contained in the operative complaint and the pending Motion to Dismiss, which at the time of mediation had not been ruled upon by the Court; 6) the desirability of consummating this Settlement to ensure that the Settlement Class received a fair and reasonable result; and 7) providing Plaintiff and Settlement Class Members prompt relief, including implementing business practice changes to address the underlying conduct of Walmart.

26. While the Parties settled relatively early in the Litigation, before Plaintiff's putative class was certified, the Parties had sufficient information to adequately evaluate the merits of the case. Plaintiff's Counsel investigated numerous Walmart stores in multiple cities of numerous states to identify the alleged Pricing Practices to determine the extent of the Pricing Practices, which products were at issue, and how prevalent the Weighted Goods were allegedly affected by the Pricing Practices. Walmart also produced Rule 26 disclosures and certain documents responsive to Plaintiff's first requests for production that were reviewed by Plaintiff's Counsel in conjunction with the Settlement.

27. Pursuant to the Settlement, Walmart has agreed to fund a non-reversionary Qualified Settlement Fund in a minimum amount (*i.e.*, Floor) of $4,500,000.00, up to a maximum amount (*i.e.*, Ceiling) of $9,500,000.00. The Qualified Settlement Fund will be used to pay for the benefits to the Settlement Class, Notice and administration costs, as well as Attorneys' Fees, Costs,

and Expenses, and Litigation Expenses.

28. The first component of the Settlement is for those Settlement Class Members who purchased Weighted Goods during the Class Period but have not retained proofs of purchase or other documentation due to the nature of the Weighted Goods (*i.e.*, the Weighted Goods expire and proofs of purchase are seldom retained). The documentation necessary is not overly burdensome—in fact, it consists of an attestation to the number of Weighted Goods the Settlement Class Member purchased during the Class Period to recover monetary benefits. If the claim is rejected for any reason, there is also a consumer-friendly appeals process whereby claimants will have the opportunity to cure any deficiencies in their submission or request an appeal if the Claims Administrator determines a claim is deficient in whole or part.

29. The second component of the Settlement is for those Settlement Class Members who purchased Weighted Goods during the Class Period, retained proofs of purchase or other documentation, but did not retain proof of the packaging to demonstrate the amount of overpayment. This is an important benefit as Settlement Class Members can receive additional monetary benefits with the additional requirement of proof of purchase. Likewise, this claims procedure is subject to the consumer-friendly process, providing claimants with the opportunity to correct any deficiencies in their submission and appeal rights.

30. The third and final component of the Settlement is for those Settlement Class Members who purchased Weighted Goods during the Class Period, retained proofs of purchase or other documentation, and retained proof of the packaging to demonstrate the amount of overpayment. This benefit is crucial because it permits Settlement Class Members to recover all amounts they were overcharged during the Class Period. As with the other forms of monetary benefits, the claims procedure is subject to the consumer-friendly process, providing claimants

with the opportunity to correct any deficiencies in their submission and appeal rights.

31. Based on my experience and that of my co-counsel, the Qualified Settlement Fund will be more than adequate to fund all of the benefits offered under the Settlement. The Settlement provides tiered recoveries based on the respective levels of proof Settlement Class Members are able to provide. Due to the nature of the short life and expirations of the Weighted Goods, it is overwhelmingly likely that the substantial majority of Settlement Class Members will avail themselves of the first category of recovery (*i.e.*, self-attested purchases); however, the Settlement provides meaningful monetary benefits to those Settlement Class Members who have additional evidentiary proof—including full recovery for overcharges with appropriate evidence. Thus, while there are situations where a Settlement Class Member could recover the entirety of their overcharges during the Class Period, those instances are typically outliers.

32. Given our experience studying claims rates and benefits selection in other fraudulent, deceptive, and unfair trade practices, I expect that the Qualified Settlement Fund will be sufficient to pay out all claims. This process, as well as the structure of the Floor and Ceiling to the Settlement, will ensure that all Settlement funds will be used to directly benefit the Settlement Class with no reversion of any funds to Walmart.

33. In addition to the monetary compensation provided to Settlement Class Members by the Settlement, Walmart has agreed to adopt and implement certain business practice commitments and remedial measures for at least three years after the Effective Date.

34. The Parties propose that Epiq Class Action Claims Solutions, Inc. ("Epiq"), be appointed as the Claims Administrator tasked with providing Notice and processing claims. Epiq is a nationally recognized class action notice and administration firm that has designed a class notice program for this case, which the Parties and Epiq believe is an effective program. Subject

to Court approval, this Notice program utilizes national consumer print publications, internet banner advertising, social media, sponsored search, and a national information release. The approximate cost of Notice and administration of claims is $560,000.00, which will be paid from the Qualified Settlement Fund.

35. Epiq will also establish a Settlement Website in the form agreed to by the Parties and the Court. In addition to the Notice, the Settlement Website will include information about the Settlement, related case documents, and the Settlement Agreement. Settlement Class Members can submit claims by mail or electronically through the Settlement Website. The documentation necessary to establish entitlement to monetary benefits can be uploaded through the Settlement Website or mailed in paper form.

36. The Notice uses plain English in an easy-to-read format that concisely explains to Settlement Class Members the nature of the Litigation and their options under the Settlement. It includes information such as the case caption, a description of the Settlement Class, a description of the claims and the history of the Litigation, a description of the Settlement and the claims being released, the names of Plaintiff's Counsel, a statement of the maximum amount of Attorneys' Fees, Costs, and Expenses, as well as Litigation Expenses, that will be sought by Plaintiff's Counsel, the maximum amount Plaintiff's Counsel will seek for a Service Award at the final approval hearing, a description of the procedures and deadlines for requesting exclusion and objecting to the Settlement, a link to the Settlement Website containing relevant case documents, and the manner in which to obtain further information.

37. The Qualified Settlement Fund also will be used to pay for an award of Attorneys' Fees, Costs, and Expenses, Litigation Expenses, and a Service Award payment as approved by the Court. Plaintiff's Counsel will move for an attorneys' fees award not to exceed one-quarter

(25%) of the Qualified Settlement Fund and for reimbursement of Litigation Expenses not to exceed $100,000.00. Plaintiff's Counsel will also move for a Service Award payment for the Plaintiff not to exceed $25,000.00 for his time and effort in pursing this Litigation on behalf of the Settlement Class. The Plaintiff's approval of the Settlement is not conditioned in any manner on his receiving a Service Award or its amount. Plaintiff's Counsel will file the motion for attorneys' fees, costs, and expenses, and service award payment no later than 21 days before the Opt-Out and Objection Deadlines. Walmart takes no position on the amounts to be sought for Attorneys' Fees, Costs, and Expenses or for a Service Award, but does not object to reasonable awards by the Court.

38. In exchange for the benefits provided under the Settlement, Settlement Class Members will release any legal claims that may arise from or relate to the facts and claims alleged in the Complaint filed in this Litigation.

39. Plaintiff's Counsel, attorneys with extensive experience in leading class actions, believe that the relief afforded by the Settlement is fair, reasonable, adequate, and comparable to other settlements on record. The costs, risks, and delay of trial and appeal weigh in favor of settlement approval. Although Plaintiff's Counsel is confident in the merits of their claims, the risks involved in prosecuting a class action through trial cannot be disregarded. Although Plaintiff's claims survived Walmart's Motion to Dismiss, those claims would still need to survive likely motions practice (*e.g.*, a motion for summary judgment) and succeed at class certification. Through the Settlement, Plaintiff and Settlement Class Members gain significant benefits without having to face further risk.

40. The delay attendant in continuing to litigate this case also favors approval of the Settlement. This Litigation has been pending longer than a year. Even before the COVID-19

pandemic, which will likely cause significant delay across federal civil cases, many more months and significant additional costs would be required for the Parties and the Court to complete the pre-trial proceedings, summary judgment and *Daubert* motions, and class certification. After trial, the Parties could appeal the Court's class certification and summary judgment decisions, which could take years to complete. Assuming the Parties went to trial and verdict, there would remain the possibility that the verdict could be reversed by this Court or on appeal.

41. By contrast, the proposed Settlement Agreement provides the Settlement Class with substantial, guaranteed relief now. A relatively early settlement is especially warranted here because it provides relief to Settlement Class Members during uncertain financial times with COVID-19. This Settlement provides benefits to the *entire* class, including reimbursement for monetary damages—regardless of whether the Settlement Class Member kept their respective proofs of purchase and packaging of the Weighted Goods.

42. The settlement distribution process, developed with Plaintiff's Counsel's knowledge and experience overseeing the administration of fraudulent, deceptive, and unfair trade practices class action settlements, will be efficient and effective. Settlement Class Members can easily file claims regardless of the level of documentation they have, but the documentation requirements for additional relief are not onerous (and not even required for many benefits); and, there is a consumer-friendly appeal process if a claim is denied in whole or part.

43. The Settlement treats all Settlement Class Members equitably relative to one another because all who have been damaged are eligible to receive reimbursement based on expenses incurred, not on any unequitable basis.

44. Plaintiff, the proposed Settlement Class Representative, is a member of the Settlement Class and does not possess any interests antagonistic to the Settlement Class. He

purchased the Weighted Goods subject to the Pricing Practices during the Class Period and, as demonstrated in his Complaint, overpaid for the Weighted Goods with documentation and proof of same. Additionally, Plaintiff has vigorously prosecuted this case for the benefit of all Settlement Class Members by filing the underlying Litigation, reviewing pleadings, conferring with Plaintiff's Counsel, and providing input at mediation and in crafting and approving the Settlement.

45. In addition, Plaintiff's Counsel are clearly qualified to represent the Settlement Class. We have extensive experience in prosecuting fraudulent, deceptive, and unfair trade practices cases. In this case, we have spent considerable time investigating the Pricing Practices and Weighted Goods across the country, and negotiating a well-informed Settlement on behalf of the Settlement Class.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on August 7, 2020, at Tampa, Florida.

_____
JOHN A. YANCHUNIS, ESQ.